DOW CHEMICAL COMPANY AND
SUBSIDIARIES, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 00–10331–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Aug. 12, 2003.

Valorie J. Gilfeather, Dow Chemical Company Legal Department, Midland, MI, Richard C. Stark, John B. Magee, and Nelson McKee, Washington, DC, for plaintiff.

Dennis M. Donohue, Joseph A. Sergi, Alex E. Sadler, Nicole M. Bielawski, Maggie O'Shaughnessy, Department of Justice, Tax Division, Washington, DC, and James A. Brunson, U.S. Attorney's Office, Bay City, MI, for defendant.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN· PART DEFENDANT'S MOTION TO AMEND JUDGMENT AND FOR ADDITIONAL FINDINGS AND GRANTING CERTAIN PROCEDURAL MOTIONS

LAWSON, District Judge.

On March 31, 2003, this Court entered judgment in favor of the taxpayer, plaintiff Dow Chemical Company and its subsidiaries ("Dow"), in this civil action seeking a refund of monies the plaintiffs paid to the United States Treasury to cover deficiencies assessed by the Internal Revenue Service after it disallowed deductions claimed by Dow for the interest paid on loans taken to pay premiums on corporate-owned life insurance policies ("COLI"). This matter is before the Court on the government's motion seeking amendment of the Court's judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and additional factual findings in support of this amendment pursuant to Rule 52(b). Procedural motions related to the briefing of these post-trial issues have also been filed by both parties.

The government argues, in essence, that the Court failed to fully appreciate-and rule upon-the consequences that logically flowed from the Court's determination that partial withdrawals taken to pay policy premiums for certain years in both COLI plans at issue were factual shams. The government also invites the Court to expand the basis for reconsideration and reassess its conclusion that the two COLI plans did not constitute economic shams in light of a recent Sixth Circuit ruling. The Court agrees with the government that the logical extension of the finding that the partial withdrawals are factual shams likely leads to the conclusion that loan interest was not paid in years four through six of each of the plans, and that the plans thereby would have terminated by their own terms. However, that did not happen in reality: the parties treated the policies as continuing in full force, and treated the partial withdrawals, and premium and interest payments in plan years four, five, and six, as if they really happened. In light of the gloss on the law relating to factual shams recently set forth by the

Sixth Circuit, following an earlier Third Circuit decision relating to COLI plans, the Court accepts the government's invitation to *sua sponte* expand the basis for reconsideration of this Court's Opinion, but not in the manner the government seeks. The Court will vacate its original finding that the partial withdrawals taken in years four through seven of the COLI plans were factual shams, and otherwise deny the government's Rule 59(e) and 52(b) motion. The Court believes that its treatment of the economic sham issue was correct, and will not alter its opinion or judgment as to those findings and conclusions.

## I.

As previously mentioned, the Court filed its opinion and judgment in favor of the plaintiff on March 31, 2003 and ordered a refund of taxes paid. Specifically, the Court concluded that the two COLI plans at issue, issued by Great West Life Assurance Company and Metropolitan Life Insurance Company respectively, were not economic shams and, in most respects, did not rely on factual shams to generate deductions for policy loan interest. The sole exception was the partial withdrawal device utilized by Dow and the two insurance companies to pay 90% of the premiums due in years four through seven of both plans, which the Court found to be a factual sham because it called for withdrawal of encumbered policy value contrary to the terms of both plans, and thus sanctioned the withdrawal of funds that were not available for that purpose, according to the written documents that constituted the parties' agreements. This finding left Dow with a substantial reduction in the amount of premium payments that the Court found were actually made in plan years four through seven. Nonetheless, the Court found Dow could still deduct the policy loan interest under the terms of the Internal Revenue Code because the financing strategy did not contravene the so-called "four-of-seven safe harbor," which the Court interpreted not to require level premium amounts over the relevant period when premium payments substantially declined over the course of the first seven years of the life insurance policy.

The government responded to the Court's Judgment, and its findings and conclusions of law memorialized in its Opinion and Order, by timely filing a motion seeking amendment of the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, and additional findings of fact pursuant to Rule 52(b) to support any decision to amend the judgment. Dow filed a brief in opposition to the request for additional factual findings, and noted that a response to the Rule 59(e) portion of the motion was not permitted absent leave of the Court. The government replied by tendering a proposed eight-page reply brief along with a motion to permit a reply brief of eight pages in length and a request for the Court to *sua sponte* expand the basis of the Rule 59(e) motion to encompass changes to be made to the Court's Opinion in light of the Sixth Circuit's opinion in *American Electric Power Co. v. United States*, 326 F.3d 737 (6th Cir.2003), decided four weeks after the opinion in this case was filed.

Dow responded to the government's latest filing with a brief opposing the expanded reply brief and also opposing any briefing of the Sixth Circuit's *AEP* decision, asserting that such briefing was unnecessary and inappropriate. Dow also tendered a motion to file this response out-of-time. The parties have since submitted a stipulation permitting Dow to file this response brief out of time.

## II.

Federal Rule of Civil Procedure 59(e) provides: "Any motion to alter or

amend a judgment shall be filed no later than 10 days after entry of the judgment." The decision of whether to grant relief under Rule 59(e) is discretionary with the district court. *Davis by Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 132 (6th Cir.1990). Such a motion will generally be granted if the district court made a clear error of law, if there is an intervening change in the controlling law, or if granting the motion will prevent manifest injustice. *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir.1999). A Rule 59(e) motion is not properly used as a vehicle to re-hash old arguments or to advance positions that could have been argued earlier, but were not. *Sault Ste. Marie Tribe of Chippewa Indian v. Engler*, 146 F.3d 367, 374 (6th Cir.1998). Once a timely motion has been filed under this Rule, the district court has the discretion to reconsider any part of its final opinion and judgment, not only those sought to be corrected by the moving party. *EEOC v. United Ass'n of Journeyman & Apprentices*, 235 F.3d 244, 250 (6th Cir. 2000).

■ Federal Rule of Civil Procedure 52(b) provides that "[o]n a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings-or make additional findings-and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." The basis for such a motion is similar to that raised under Rule 59(e), and therefore also rests within the district court's sound discretion. *Hollis v. City of Buffalo*, 189 F.R.D. 260, 262 (W.D.N.Y.1999). Relief under this section is appropriate in cases of manifest factual error, if newly discovered evidence is available, or where further action by the Court would clarify the record for appeal. *Ibid.* Once again, Rule 52(b) may not be used by the parties simply to relitigate issues already decided or matters that could have been raised earlier. *Diebitz v. Arreola*, 834 F.Supp. 298, 302 (E.D.Wis.1993). As the text of the Rule makes clear, it is not at all unusual for a Rule 52(b) motion to accompany a Rule 59(e) motion in matters tried to the Court. *Ibid.* Erroneous factual findings need not be amended under this rule if they are immaterial to the case's ultimate disposition. *Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.*, 609 F.Supp. 451, 453 (S.D.N.Y.1984). · ·

The defendant's motion in this case was brought in good faith and is properly lodged under Rules 52(b) and 59(e). This was an extremely complicated case in which the Court resolved some of the pertinent issues in a manner that differed from the propositions advanced by the government. As a result, significant portions of the Court's reasoning were not subjected to analysis by the parties, and now deserve a second look in light of the Court's gloss on the issues presented. The Court believes that the defendant has properly limited itself to challenging aspects of the Court's reasoning not previously discussed by the parties, and thus properly brings its motion under Rules 52(b) and 59(e).

### A.

The government argues that the Court did not properly carry through its reasoning that the partial withdrawals used to pay premiums in years four through six of both COLI plans were factual shams. The government observes that if the partial withdrawals were shams in fact, then not only were the premiums not paid for those years (except for that portion paid in cash, about 10% of the total amount due), but also the interest payments for those years remained unpaid. The government further contends that Dow should not be permitted to deduct the interest for those

years, since it was never paid as a result of shamming the partial withdrawals. Further, the argument continues, if the interest is unpaid, the Great West and MetLife policies terminated in the fourth policy year by their own terms as a result of the failure to pay loan interest. The base policy for Great West provides that the "policy will terminate when the indebtedness equals or is more than the cash surrender value plus any dividend credits." Ex. J1147, Base Policy Form Number X105, at 11. The base policy for MetLife states that the "Group Policy will terminate" if loan interest is not repaid and "the Cash Surrender Value is insufficient to pay the Monthly Deduction due on a Monthly Date." Ex. J593 at 11. In both cases, because the payments made on loan interest were factual shams based on encumbered funds that did not exist for this purpose, the argument goes, the policies terminated by their own operation.

The problem with this argument is that the scenario that the government posits in theory never in fact occurred. Under both the Great West and MetLife COLI plans, the policies remained in force well after the fourth policy year, policy loans continued in year seven and beyond, premiums were paid by Dow and the insurance companies paid state taxes on those premiums, death benefits continued to be paid, and the economic consequences of policies-inforce continued to be realized and acknowledged by both parties. In other words, it appears that the transactions actually occurred, despite the fact that the partial withdrawals contravened the express terms of the insurance contracts, as previously determined by the Court. *See Dow v. United States*, 250 F.Supp.2d 748, 811–12 (E.D.Mich.2003). Given these facts, and in light of *dicta* in *In re CM Holdings*, 301 F.3d 96, 108 (3d Cir.2002), and *American Elec. Power Co. v. United States*, 326 F.3d 737, 745 (6th Cir.2003), the Court

feels compelled to reexamine its holding that the partial withdrawals were factual shams.

In its Opinion filed March 31, 2001, the Court described the sham-in-fact doctrine as follows:

> In deciding whether a transaction is a sham in fact, the Court examines the nature and form of the transaction to determine what actually occurred. In making this assessment, the Court "will ignore accounting tricks and other transactional artifices." *CM Holdings*, 254 B.R. [578], 600 (D.Del.2000) (quoting *Peerless Indus., Inc. v. United States*, 1994 WL 13837 at *4 (E.D.Pa.), *aff'd*, 37 F.3d 1488 (3rd Cir.1994)). The Court considers whether appropriate business formalities are employed, industry customs and practices are followed, and there is compliance with relevant commercial norms. Thus, paper transactions which solely attempt to create deductible losses or expenses are not recognized. *Woolford Realty v. Rose*, 286 U.S. 319, 330, 52 S.Ct. 568, 76 L.Ed. 1128 (1932) (stating that "[t]he mind rebels against the notion that Congress ... [was] willing to foster an opportunity for juggling so facile and so obvious"). But transactions involving two or more parties which are grounded in commercial custom and have present or future economic consequence to one or more parties will be recognized. *See CM Holdings*, 254 B.R. at 600 and cases cited therein.

*Dow*, 250 F.Supp.2d at 811–12. As this Court noted in its opinion, the district court in *CM Holdings* found the loading dividends used to finance premiums in years four through seven of the COLI policies in that case to be factual shams on the basis that they did not conform with industry practice:

In order to calculate the dividend amounts, the policies charged administrative fees considerably out of proportion to the actual costs incurred. Furthermore, instead of distributing the dividend from accumulated surplus, the policies "sourced" their dividends from excessive loading charges which were instantaneously offset against payment of the premium. The lack of any contributions to the dividends from investment yields was also suspicious. The district court was also troubled by the payment of the dividends at the beginning of the policy year, rather than the industry-standard practice of paying at the end of the year. The legitimacy of the dividends was further compromised by the fact that they were guaranteed, not contingent. Topping it off, the designers of the COLI plan did not treat the dividends as a liability on its balance sheets. The combination of all these factors provided "overwhelming evidence" to the district court that the loading dividends were factual shams.

*Id.* at 760–61 (citing *CM Holdings*, 254 B.R. at 617–20). Although the Third Circuit affirmed the lower court's opinion that the COLI plan was a sham in substance, thus disposing of the case, it found in *dicta* that the lower court had erred in concluding that the loading dividends were factual shams. Factual shams, the Third Circuit made clear, are transactions that never occurred, not transactions that did occur, but were improper by industry standards. *In re CM Holdings*, 301 F.3d 96, 108 (3d Cir.2002). The Court suggested an exception to this rule where the transaction in question was plainly "performed in violation of some of the background assumptions of commercial dealing, for example arms-length dealing at fair market values," *id.* (citing *Horn v. Commissioner*, 968 F.2d 1229, 1236 n. 8 (D.C.Cir.1992)). Generally speaking, however, the impropriety of a transaction with regard to standard "industry practice" is evidence of an overall economic sham, not an illusory transaction in and of itself. *Id.*

The findings of the district court and Sixth Circuit in the *American Electric Power* case follow the same pattern. Relying heavily on the analysis of the *CM Holdings* district court, the district court in *American Electric Power, Inc. v. United States*, 136 F.Supp.2d 762, 782–83 (S.D.Ohio 2001), concluded that the loading dividends in that COLI plan were also factual shams, finding the basis for the dividends to have no reasonable grounding in the actual costs of administering the policies and generally inconsistent with industry norms. On review, the Sixth Circuit, having affirmed that AEP's COLI plan was an economic sham, agreed with the Third Circuit, again in *dicta,* that the lower court's factual sham analysis was problematic. *See American Elec. Power Co. v. United States,* 326 F.3d 737, 745 (6th Cir.2003). Citing *Kennedy v. Commissioner,* 876 F.2d 1251 (6th Cir.1989) and *Forseth v. Commissioner,* 85 T.C. 127, 1985 WL 15375 (1985), the Sixth Circuit noted that both cases found certain transactions to be factual shams because the monies paid had no purpose other than to create tax deductions and were not actually expended for their stated use. In other words, "the purported transactions in those cases on which the taxpayers claimed deductions had not actually occurred," and were thus factual shams. 326 F.3d at 745. However, the Sixth Circuit found no evidence that the loading dividend transactions in the AEP plan, even if accomplished by circular netting transactions, "did not actually occur." *Ibid.* The court of appeals thus stated that in suggesting that noncompliance with industry practice was sufficient to support a factual sham finding, the district court appeared

"to be extending the factual-sham doctrine beyond its generally accepted definition." *Ibid* (adopting the Third Circuit's finding in this regard from *CM Holdings,* 301 F.3d at 108).

■ Thus, two Circuit Courts of Appeals, one of which is the Circuit Court whose rulings bind this Court, have provided a definition of factual sham that all but disregards the propriety of the transaction in question in favor of an analysis that focuses simply on whether the transactions actually occurred. To be sure, both decisions made these findings in *dicta.* Nonetheless, although *dicta,* the Sixth Circuit's conclusions with regard to the loading dividends used in the *AEP* policies signal that the scope of this Court's factual sham analysis, which took into account "whether appropriate business formalities [were] employed, industry customs and practices [were] followed, and . . . compliance with relevant commercial norms," 250 F.Supp.2d at 811, was overly broad. This Court concludes that the Sixth Circuit, in light of its *AEP dicta,* will likely adopt the Third Circuit's conclusion that the propriety of any particular transaction, except in the most flagrant cases, is properly reserved for a sham in substance analysis, and that the factual sham analysis should be limited simply to the question of whether the transaction in question actually occurred.

■ This Court deems it prudent to follow the *dictum* laid down by the Sixth Circuit in a case with parallel facts and nearly identical issues. As noted above, the transactions which comprised the partial withdrawals actually occurred and caused real economic consequences. Accordingly, they do not fit within the revised definition of "sham in fact."

■ It is also pertinent to note that parties to a written agreement may act *inter se* in a manner that departs from the terms of the agreement, to the extent that the performance of the contract is not somehow contrary to law or the interests of some other beneficiary. In the consensual framework that characterizes contractual relationships, the parties are free to interpret their contract in a mutually agreed manner, or excuse performance, or subsequently modify its terms. *See, e.g., Restatement (Second) of Contracts* § 5 cmt. a (1981) ("The terms of a promise or agreement are those expressed in the language of the parties or implied in fact from other conduct. Both language and conduct are to be understood in the light of the circumstances, including course of dealing or usage of trade or course of performance."); *id.* § 201(1) ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning."); *id.* § 202 cmt. g ("Where it is unreasonable to interpret the contract in accordance with the course of performance, the conduct of the parties may be evidence of an agreed modification or of a waiver by one party."); *id.* § 287(1) ("If a party, knowing of an alteration that discharges his duty, manifests assent to the altered terms, his manifestation is equivalent to an acceptance of an offer to substitute those terms."). Michigan law incorporates these concepts. *See, e.g., Michigan Portland Cement Co. v. General Builders Supply Co.,* 240 Mich. 701, 703, 216 N.W. 376 (1927); *American Locomotive Co. v. Gyro Process Co. et al.,* 185 F.2d 316, 319–20 (6th Cir.1950).

The Court's previous conclusion that the partial withdrawals are were shams in fact therefore was not correct, and the Court vacates that portion of the opinion so holding. This holding renders moot the government's argument relating to the logical consequences that would flow from a determination that the partial withdrawals in

plan years four through six were factual shams.

## B.

The government also attacks this Court's opinion in two other respects. First, the government contends that the Court has confounded the concept of mortality neutrality and risk transfer, and therefore has erroneously concluded that the potential for realizing mortality gains in the plans was one component that imbued them with economic substance apart from the tax deductions for policy loan interest. Second, the government takes issue with the Court's assessment of the net present value of each of the plans because of a perception on the part of the government that the calculations relied upon do not subtract the effect of the income tax deductions, and therefore fail to evaluate the economic substance of the plans absent the tax benefits. The government contends that the Sixth Circuit wrote to both of these issues in *AEP,* and the Court should *sua sponte* expand the grounds for reconsideration and address these issues in light of the recent appellate decision.

### 1.

The court of appeals drew a distinction between the terms "mortality neutrality" and "transfer of risk" in *AEP* largely on the basis of its focus on individual policies on one hand, and the operation of the entire plan on the other. Mindful that the core issue was whether the plan in *AEP* had economic substance, the court stated:

> Similar reasoning leads us to reject AEP's argument that because "each individual COLI policy transfers risk and has economic substance," the COLI plan as a whole must have economic substance. Each individual COLI policy did in fact transfer risk and thereby have economic substance, as was the

case in. *Woodson–Tenent.* Mortality neutrality, however, operated on the plan as a whole, ensuring that whatever transfer of risk occurred at the level of the individual policy ceased to exist for the overall plan.... Mortality neutrality and zero net equity operated only at the level of the entire plan.

*AEP,* 326 F.3d at 742–43. This Court interchanged the terms in its opinion, however no error or analytical flaw resulted since the Court consistently applied the terminology to an assessment of the plans as a whole, not the individual policies, in the manner criticized by the court of appeals in *AEP.* Moreover, "mortality neutrality" is a term the government itself invented for its COLI litigation, and therefore the Court must discount to some extent the government's critique that this Court failed to "properly" use a term that has no basis in actuarial science. *Dow,* 250 F.Supp.2d at 807 & n. 6. More importantly, this distinction is not material to the Court's resolution of this case. Although this Court did focus its analysis with regard to mortality by finding that there was no 100% "true-up" of benefits and costs at the end of each year, it necessarily follows that a plan that is not designed to eliminate every dime of mortality profit (i.e., the potential to receive more in death benefit than the amount expended on the cost of insurance) cannot be "mortality neutral" over the long term either. The presence of risk transfer and the possibility of a mortality profit *on a plan-wide basis* was one of the grounds on which this Court based its finding that the COLI plans were imbued with economic substance independent of the income tax deductions. Once again, this assessment required an analysis of the plan, not the individual policies, especially in the case of the MetLife plan, which was written on a group policy form. The Court believes

that its treatment of the issue of "mortality neutrality" was complete, correct, and consistent with the statements of the court of appeals in *AEP*. There is no need, therefore, to subject this aspect of the case to further litigation by expanded briefing or otherwise.

### 2.

Nor does the Court find that anything the Sixth Circuit wrote in *AEP* affects the basis on which this Court evaluated the economic viability of the policies. The Sixth Circuit did emphasize that the economic viability of a transaction (as measured in net present value, or NPV) should be evaluated on a "pre-tax" basis, meaning that the effect of the tax deductions must be subtracted. But the deduction the Sixth Circuit sought to exclude from the analysis was for the loan interest, not the tax benefit from the deferred inside build-up itself. *AEP*, 326 F.3d at 743–44. "Life insurance is tax-favored, and a company may utilize the tax advantages of a COLI plan so long as the plan has real economic consequences." *Id.* at 744.

█ Here, the government's urging that a pure "pre-tax" method be used ignores one of the legitimate, tax-advantaged purposes of purchasing life insurance in the first place, which is to secure tax-free inside build-up. The testimony of Dow's experts, which the Court found to be both credible and reliable, *see Dow*, 250 F.Supp.2d at 806–07, demonstrated that the best compromise between a pure "pre-tax" evaluation—which ignores the tax-deferred purpose of the transaction—and a pure "post-tax" analysis—which "would swallow the sham analysis entirely," *AEP*, 326 F.3d at 743—is to use a pre-tax net present value analysis with a lowered discount factor. *Dow*, 250 F.Supp.2d at 806–07. As the Third Circuit made clear in *CM Holdings:*

The point of the analysis is to remove from consideration the challenged tax deduction, and evaluate the transaction on its merits, to see if it makes sense economically or is mere tax arbitrage. Courts use "pre-tax" as shorthand for this, but *they do not imply that the court must imagine a world without taxes*, and evaluate the transaction accordingly. Instead, they focus on the abuse of the deductions claimed: "[w]here a transaction has no substance other than to create deductions, the transaction is disregarded for tax purposes." *[United States v.] Wexler*, [31 F.3d 117,] 122 [3d Cir.1994]. Choosing a tax-favored investment vehicle is fine, but engaging in an empty transaction that shuffles payments for the sole purpose of generating a deduction is not.

301 F.3d at 105 (citations omitted) (emphasis added), *quoted with approval by AEP*, 326 F.3d at 743–44. Similarly, Dow was not required at the time the policies were to purchased to pretend that it lived in a tax-free environment. Rather, it was required to determine whether the deductions would be enhancing the benefit of an already economically viable set of transactions. None of the methods for evaluating the net present value of Dow's policies could pretend to predict exact results, and Dow's decision to use the method it did for evaluating the viability of the policies was not unreasonable under the circumstances, as this Court concluded in its original opinion. *See* 250 F.Supp.2d at 806–07, 809–10. Likewise, the Court's analysis of the "pre-tax" viability of the COLI plans accounted for the effect of the tax deductions and, consistent with the court of appeals' pronouncement in *AEP*, evaluated the projected economic results absent the tax deductions, in concluding that both plans offered substantial, non-tax benefits that would be realized by Dow over the

life of the plans. *See Dow*, 250 F.Supp.2d at 807, 810–11.

As this Court concluded in its opinion, the policies in this case were not "empty transactions[s]" entered into "for the sole purpose of generating a deduction," 301 F.3d at 105, and the COLI policies were therefore not an economic sham. The Court sees no necessity to revisit this issue in light of *AEP*.

### III.

Although statements by the Sixth Circuit in *AEP* have propelled the Court to reassess its treatment of the partial withdrawal features of the COLI plans under a sham-in-fact analysis, the Court declines to further modify its opinion in the manner urged by the government, or expand the post-judgment briefing in this case.

Accordingly, it is **ORDERED** that the defendant's motion to amend the Court's judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and make additional factual findings in support of this amendment pursuant to Rule 52(b) [dkt # 96] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the Court's opinion dated March 31, 2003 is **MODIFIED** as reflected herein. The Court's judgment remains the same.

It is further **ORDERED** that the government's request to establish a briefing schedule to determine the effect of an intervening Sixth Circuit decision on this Court's judgment [dkt # 101] is **DENIED.**

It is further **ORDERED** that the government's motions to file an expanded reply brief [dkt # s98, 101] are **GRANTED.**

It is further **ORDERED** that the plaintiff's request, accompanied by a stipulation of the parties, to file a response out-of-time [dkt # 103] is **GRANTED.**